Filed 5/15/25  P. v. Guerra CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B330857 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA090160) |
| v. | |
| MONOLITO ALEXANDER GUERRA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, David E. Madeo and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

━━━━━━━━━━━━━━━━

A jury convicted Monolito Alexander Guerra of various assault crimes based, in relevant part, on his shooting at a car with a family of four inside and, in a separate incident, shooting at Los Angeles County Sheriff's Department deputies, injuring one.

On appeal, Guerra challenges the sufficiency of the evidence to sustain one of his convictions for assault on a Sheriff's deputy. Alternatively, Guerra contends that the trial court abused its discretion by denying his motion for a new trial on this count. We reject both arguments, concluding the evidence is sufficient to sustain the conviction and the trial court did not abuse its discretion in denying the motion for new trial.

Guerra further asserts that the trial court erred in its application of the multiple victim exception to Penal Code section 654 regarding the counts relating to shooting into the vehicle.[1] The People agree, as do we. We therefore reverse and remand for purposes of resentencing and application of section 654. We additionally direct the trial court to correct several clerical errors in the abstract of judgment.

Finally, Guerra asks us to review the sealed transcript of the in camera hearing conducted on his motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). We have done so and find no error.

---

[1] All further statutory references are to the Penal Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

*November 24, 2017 Vehicle Incident*

On November 24, 2017, Carlos Vasquez was driving with his wife and two children in the car. When they came to a stop sign, Guerra was standing nearby. He pointed a gun at Vasquez. Vasquez immediately drove away while his wife called 911. Guerra got into a car and chased Vasquez, firing two shots into the Vasquez family's car. No one was injured, but Vasquez later found a bullet on his six-month-old daughter's blanket. The car's exterior had a visible bullet hole.

*November 28, 2017 Apartment Complex Incident*

On November 28, 2017, Guerra was outside his apartment complex in the City of Newhall. He pointed a gun at a neighbor, Jacqueline Moreno. Moreno called the police.

Deputies Albert White, Tanner Sanchez, Robert Garcia, and Christopher Martin responded to the call, along with other deputies. Because of the nature of the 911 call, some of the officers responded with their lights and sirens on.

White and Sanchez arrived together in a marked Sheriff's vehicle and parked on Bottletree Lane. Garcia and Martin arrived together in a separate marked Sheriff's vehicle. The responding officers parked two patrol vehicles, bumper-to-bumper, on Bottletree Lane. Opposite the patrol cars were several cars parked in a row of marked parking spaces. The parking spaces were perpendicular to a sidewalk and in front of a bank of mailboxes, and ended near a cinderblock wall that concealed a dumpster. One of the parked cars was a white Ford Fusion. Guerra was hiding inside.

White and three other deputies were gathered by the dumpster when White volunteered to check the cars parked near

3

the mailboxes. Garcia and Martin were also in the "immediate area." White discovered Guerra hiding in the backseat of the Ford Fusion. Guerra was holding a gun.

### 1. White's Testimony

White opened the door to the Ford Fusion and told Guerra not to move. He then "yell[ed]" for his partners. White lifted his face over the vehicle so that he could project his voice loudly enough for his partners to hear him.

After calling to his partners, White saw Guerra move his hands towards Guerra's gun, so White attempted to pin Guerra's hands down. Guerra shot White at close range. White fired his gun at Guerra, then heard a second shot go off behind him. Injured, White ran to the two patrol cars parked across from the Ford Fusion, where he had last seen Garcia and Martin. White saw Garcia stand up from behind one of the patrol cars and shoot once. He heard a "barrage of gunfire" coming from the direction of the Ford Fusion.

### 2. Garcia's Testimony

Just before White's interaction with Guerra, Garcia had been standing close enough to see White checking the parked vehicles. He heard White command, " 'Show me your hands,' " or something to that effect, two or three times. Garcia headed towards White. He heard gunshots and saw a gun's muzzle flash.

Garcia ran along Bottletree Lane, using the two parked patrol vehicles as cover, towards the shooting. White ran towards him. Garcia helped White into one of the two Sheriffs' vehicles. Garcia continued to use both vehicles as cover. Martin came and helped White, who was injured, get away from the immediate area.

4

Garcia positioned himself between Martin and White and one of the patrol vehicles, facing the Ford Fusion and the area where he had seen the shots fired. Guerra stood up from behind the Ford Fusion. Garcia saw his shoulders and arms move upward. Garcia was approximately 15 to 20 feet from Guerra.

Believing Guerra was about to fire at him, Garcia fired a single round at Guerra. Guerra immediately dropped back down behind the Ford Fusion. At approximately the same time that Garcia fired at Guerra, he heard gunshots coming from his left and right, which he assumed were from other deputies. However, he did not see who fired those shots. Garcia then heard Benjamin Sanchez,[2] another responding officer, say, " 'He's down.' " Garcia and Benjamin Sanchez approached Guerra together. They found him injured and lying on his side on the sidewalk behind the row of parked cars, with a gun just out of his reach.

3. <u>Sanchez's Testimony</u>

Around the time that White discovered Guerra hiding in the Ford Fusion, Sanchez was looking for Guerra elsewhere in the apartment complex. He heard three gunshots and ran towards Bottletree Lane. At Bottletree Lane, he saw White running towards the two parked Sheriffs' vehicles, holding his neck and shouting, " 'I'm hit. I'm hit.' " Sanchez was approximately 50 feet from White.

Sanchez heard more gunshots and took a position of cover by the engine block of one of the two Sheriffs' vehicles. He then saw Guerra stand up from behind the Ford Fusion in a stance

---

[2] Because Tanner Sanchez and Benjamin Sanchez have the same last name, we refer to Benjamin Sanchez by his full name for clarity.

like a baseball catcher, looking over the trunk of the car. Guerra was in an "assaultive" position. He was looking left and did not appear to see Sanchez; however, Guerra's body was oriented towards Sanchez. While Sanchez was in Guerra's peripheral view, Guerra was nonetheless in a position to see Sanchez. Sanchez fired his weapon at Guerra while Guerra was still looking away.

### 4. Investigation

Investigating detectives recorded interviews with Guerra on December 3 and 10, 2017. Guerra said he hid when "the cops showed up." He admitted shooting White twice. After he got out of the Ford Fusion, he was "trying to duck away from the cops" and run away. However, he was "getting shot. Boom, boom. So then I was forced to really shoot . . . ." When the detectives inquired whether, after Guerra shot White the second time, other deputies had shot at him, he said, "Yes." That "forced [him] to fucken [*sic*] shoot back." He continued, "I don't think I hit him, but – but I just shot back."

A forensics investigation determined that Guerra fired four bullets during the encounter. Garcia fired one round and Benjamin Sanchez three. Sanchez and White had also fired multiple rounds.

## *Charges and Trial*

On November 30, 2020, the Los Angeles County District Attorney filed a 14-count information against Guerra. In the counts relevant to this appeal, Guerra was charged with the premeditated attempted murder of peace officers White, Sanchez, and Garcia. (§§ 664, 187, subd. (a); counts 1, 2, & 3.) He was also charged with assault with a firearm as to Vasquez, Vasquez's wife, and each of the two children, and with shooting at an

6

occupied vehicle.  (§§ 245, subd. (a)(2), 246; counts 5, 6, 7, 8, & 9.)
The information further charged Guerra with being a felon in
possession of a firearm.  (§ 29800, subd. (a)(1); count 10.)  He was
also charged with the premeditated attempted murder of
Vasquez.  (§§ 664, 187, subd. (a); count 15.)[3]  The information
alleged multiple special allegations relating to three prior strikes,
prior serious felony convictions, prior prison terms, and firearm
allegations.

A jury trial took place in April and May 2023.  At the end of
the People's case, the trial court granted Guerra's motion to
dismiss the attempted murder counts regarding Sanchez and
Garcia (counts 2 & 3) pursuant to section 1118.1.  The People
then moved to amend to conform to proof by adding counts 16, 17,
and 18, each alleging assault on a peace officer in violation of
section 245, subdivision (d)(1), and related firearm allegations.
The named victims were White (count 16), Sanchez (count 17),
and Garcia (count 18).

On counts 17 and 18, assault on a peace officer as to
victims Sanchez and Garcia, the jury found Guerra guilty only of
the lesser included offense of assault with a firearm.  (§ 245,
subd. (a)(2).)  On the remaining counts, the jury found Guerra

---

[3]     The remaining counts in the information involved other
incidents not at issue on appeal: assault with a firearm on
Jacqueline Moreno (§ 245, subd. (a)(2); count 4); corporal injury
on a spouse (§ 273.5, subd. (a); count 11); battery on a custodial
officer, David Apodaca (§ 243, subd. (c)(1); count 13); and
resisting an executive officer, Jonathan Barrera (§ 69, subd. (a);
count 14).  The information did not contain a count 12.  Counts
11, 13, and 14 pertained to an unrelated incident, and the trial
court granted Guerra's motion to sever them.  The trial court
subsequently dismissed counts 11, 13, and 14 under section 1385.

guilty as charged and the enhancements true. Guerra admitted the prior conviction allegations.

Guerra moved for a new trial on counts 17 and 18 under section 1181, subdivision (6), contending there was no evidence that Guerra assaulted either Sanchez or Garcia. The trial court granted the motion as to Garcia (count 18), but denied it as to Sanchez (count 17). The trial court dismissed count 18 on its own motion pursuant to section 1385.

The trial court sentenced Guerra to an indeterminate prison term of 95 years to life, consecutive to a determinate term of 34 years and 4 months.[4]

Guerra filed a timely notice of appeal.

## DISCUSSION

### I. Substantial Evidence Supports the Conviction for Assault with a Firearm on Deputy Sanchez (Count 17)

#### A. Standard of review and applicable legal principles

In considering whether the evidence is sufficient to support a criminal conviction, "we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) " 'The test for evaluating a sufficiency of evidence claim is deferential: "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We must "view the evidence in the

---

[4] The trial court dismissed two of Guerra's three prior strikes as to counts 4 and 17 only.

light most favorable to the People" and "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation]. We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.]" (*People v. Baker* (2021) 10 Cal.5th 1044, 1102–1103 (*Baker*).) Therefore, we do not reverse unless we conclude " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) It is well established "that assault is a general intent crime." (*People v. Chance* (2008) 44 Cal.4th 1164, 1167 (*Chance*).) "[A] specific intent to injure is not an element of assault because the assaultive act, by its nature, subsumes such an intent." (*People v. Williams* (2001) 26 Cal.4th 779, 786 (*Williams*).) Therefore, the " 'mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery.' [Citation.]" (*Id.* at p. 782.) "[A]ssault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id.* at p. 790; accord, *People v. Wyatt* (2010) 48 Cal.4th 776, 786.) Thus, the proper focus is on the " 'violent-injury-producing nature of the defendant's acts . . . .' " (*Williams*, at p. 785.)

The "present ability" component of section 240 is "satisfied when 'a defendant has attained the means and location to strike immediately.' [Citations.] In this context, however,

'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*Chance*, *supra*, 44 Cal.4th at p. 1168, fn. omitted.)

Our high court's opinions in *Williams* and *Chance* illustrate these principles. In *Williams*, the defendant fired a self-described " 'warning shot' " at the tire of the victim's truck, knowing the victim was approximately a foot and a half away. (*Williams*, *supra*, 26 Cal.4th at p. 782; see *id*. at p. 783.) A jury found Williams guilty of assault on the victim.[5] (*Williams*, at p. 783.) Our high court considered the requisite mental state for assault. The court held that assault does not require a specific intent to cause injury, but only necessitates that "a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (*Id*. at p. 788, fn. omitted.) Although a jury instruction given in the case was potentially ambiguous, any error was harmless on the facts of the case. The defendant loaded his shotgun, knew the victim was crouched on the far side of the

---

[5]     The jury deadlocked on charges of assault on the victim's two sons, who were getting into the truck at the time of the shot; the defendant testified that he never saw the sons before he fired. (*Williams*, *supra*, 26 Cal.4th at p. 783.)

truck, and he fired the warning shot even though he knew the victim was "in the near vicinity." (*Id*. at p. 790.) "In light of [those] admissions, [the] defendant undoubtedly knew those facts establishing that his act by its nature would directly, naturally and probably result in a battery." (*Ibid*.)

In *Chance*, our high court upheld a conviction of assault with a firearm on a peace officer where an officer was attempting to apprehend an armed defendant who was running away. (*Chance*, *supra*, 44 Cal.4th at p. 1168.) The defendant ran around the front of a trailer and hid. The officer went around the back of the trailer and saw the defendant facing towards the front, away from the officer, holding a gun with his arm extended. (*Ibid*.) The officer told the defendant to drop the gun. The defendant looked over his shoulder at the officer. He then brought the gun "toward[s] the center of his body, then flipped it behind him," but did not fire and began to run. (*Id*. at p. 1169; see *id*. at p. 1168.)

The *Chance* court reasoned that the evidence established the defendant had the present ability to inflict injury, even though he was aiming in the opposite direction, and the officer would have shot him first had the defendant fired at him. (*Chance*, *supra*, 44 Cal.4th at p. 1173.) The defendant's "mistake as to the officer's location was immaterial. He attained the present ability to inflict injury by positioning himself to strike on the present occasion with a loaded weapon. This conduct was sufficient to establish the actus reus required for assault." (*Id*. at p. 1176.)

*People v. Raviart* (2001) 93 Cal.App.4th 258 (*Raviart*), also provides helpful context. In *Raviart*, the defendant aimed a gun at two police officers, one of whom was at least partially hidden

11

behind a wall. The defendant contended there was insufficient evidence to support a conviction for assault on the officer who was behind a wall, claiming he only pointed his gun at the officer standing directly in front of him. The Court of Appeal upheld assault convictions for both officers because "the jury could have found beyond a reasonable doubt that when defendant was confronted by the two police officers outside the motel, he drew a loaded handgun from his waistband with the intent to shoot both officers, but he only managed to point it at one of the officers before they both shot him. By drawing the gun with the intent to shoot the officers, defendant performed an overt act sufficient to constitute an assault on both of them. Defendant did not have to perform the further act of actually pointing the gun directly at Officer Wagstaff to be guilty of assaulting Wagstaff. It was enough that defendant brought the gun into a position where he could have used it against Wagstaff if the officers had not shot him first." (*Id.* at p. 266; see *id.* at pp. 261–262, 264–265, 267.)

## B. Substantial evidence supports the conviction

Guerra contends there is insufficient evidence to support his assault with a firearm conviction as to Sanchez because there is no evidence he pointed a firearm in Sanchez's direction, or intended to do so, and no evidence he was even aware of Sanchez's presence. We disagree.

There is substantial evidence that Guerra knew there were multiple deputies on the scene. He told the investigating detectives that the "cops showed up." The deputies arrived in marked cars, at least one of which was employing lights and sirens. Guerra hid in a car near where the deputies parked two marked cars. After White commanded Guerra not to move, White yelled to other deputies for backup. Guerra then shot in

12

White's direction twice, and White ran towards the parked patrol cars, shouting that he had been hit.

With this knowledge that more than one deputy was in the area, Guerra shot in the direction of the marked patrol cars. Garcia, sheltering behind the patrol cars, fired once at Guerra. Sanchez also fired shots from behind one of the two patrol cars parked in a line. Guerra admitted that he shot back: "I was getting shot at, boom, boom, boom. So, and that forced me to . . . shoot back." Ballistics evidence also showed that Guerra fired two shots in addition to the two he fired at White.

Guerra contends this evidence was insufficient because it did not establish he was aware of Sanchez or attempted to injure him. However, even if Guerra did not see Sanchez, or point a gun directly at him when he returned fire, "[t]hat degree of immediacy is not necessary." (*Chance*, *supra*, 44 Cal.4th at p. 1176.) Guerra simply needed to have "actual knowledge of those facts sufficient to establish that the offending act by its nature," namely his act of shooting twice in the direction of the gunshots coming from behind the patrol cars, "would probably and directly result in physical force being applied to another." (*Williams*, *supra*, 26 Cal.4th at p. 784.)

Guerra knew there was at least one deputy in addition to White present (to whom White was calling for backup and yelling that he was hurt, and because there were at least two cars where he was aiming). The jury could find beyond a reasonable doubt that Guerra intended to shoot the deputies who were behind the patrol cars and were shooting at him. (*Raviart*, *supra*, 93 Cal.App.4th at p. 267.)

Guerra was not required to fire a shot at each victim to complete the assault. (*Raviart*, *supra*, 93 Cal.App.4th at p. 267

13

[gun only aimed at officers; no shots fired]; see *People v. Perez* (2010) 50 Cal.4th 222, 225 [one shot towards seven officers and a civilian "endangered the lives of every individual in the group into which he fired the single shot" and supported convictions on seven assault counts].)  In general, "displaying a gun and/or firing it in the general direction of others is sufficient to provide the mens rea for an assault charge where there is animus between the defendant and the targeted party and/or the surrounding circumstances are fraught." (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 210.)  A reasonable jury could have concluded that, by shooting in attempt to return the fire that was coming from behind the two marked patrol vehicles, and with the knowledge that more than one deputy was present, Guerra committed an assault on Sanchez.

Guerra attempts to distinguish *Chance* and *Raviart* on the ground that in those cases the defendant was aware of the person he assaulted, but, here, he did not know Sanchez was present. Guerra also asserts *Raviart* is distinguishable because in that case the second officer was within several feet of the first officer. These arguments are not persuasive.  As in *Raviart*, the jury here could reasonably infer that Guerra knew there were at least two deputies present.  Sanchez and Garcia were behind the two marked Sheriffs' vehicles, parked in a line, bumper-to-bumper, when Guerra fired "back."  Even if the two deputies were at the very opposite ends of the vehicle formation, they were still relatively near each other.[6]

---

[6] Sanchez testified that when he first saw White running across Bottletree Lane, White was approximately 50 feet away from him.  At that moment, Sanchez had run from between an

14

Sanchez testified that although he was in Guerra's "peripheral view," and Guerra was not looking directly at him, Guerra appeared to be in a combative posture, scanning for "additional targets."  Accepting all logical inferences from the evidence (*Baker*, *supra*, 10 Cal.5th at pp. 1102–1103), we conclude there is substantial evidence to support the conviction for assault on Sanchez.  (See *People v. Lee Kong* (1892) 95 Cal. 666, 670 [defendant knew police officer was on the roof and shot from inside at the spot where he believed officer would be; officer was some distance away and was not injured; defendant's "mistake as to the policeman's exact location upon the roof" did not make the act any "less an assault"].)

## II.     The Trial Court Did Not Abuse Its Discretion In Denying the Motion for a New Trial on Count 17

Guerra next contends the trial court erred when it denied his motion for a new trial pursuant to section 1181, subdivision (6), on the count for the assault of Sanchez.  We find no abuse of discretion.

Section 1181, subdivision 6, permits a trial court to modify the verdict when a "verdict or finding is contrary to law or evidence."  "In reviewing a motion for a new trial, the trial court must weigh the evidence independently.  [Citation.]  It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it.  [Citation.]  The trial court 'should [not] disregard the verdict . . . but instead . . .

---

apartment building and pool to Bottletree Lane and was in front of a building.  After Sanchez saw White, he heard more gunshots and took cover behind the patrol vehicles.  The evidence does not indicate that Sanchez was approximately 50 feet from Garcia when they were both behind the patrol cars.

should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 523–524 (*Davis*).) "The court extends no evidentiary deference in ruling on a section 1181(6) motion for new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' [Citations.]" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.)

A trial court has "broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion." (*Davis*, *supra*, 10 Cal.4th at p. 524.) " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citation.]" (*Ibid*.; see also *People v. Alfaro* (2007) 41 Cal.4th 1277, 1335.)

Guerra contended a new trial was warranted because Sanchez testified Guerra had not seen him before Sanchez fired his weapon, and Sanchez had not seen Guerra's hands or weapon before firing. Guerra further argued that the only evidence to support the assault conviction was Guerra's statement that he fired back towards deputies after he was shot at, but that he clarified that he only shot twice, both times at White.[7]

In denying the motion for a new trial on the count of assault against Sanchez, the trial court provided two reasons.

---

[7] This statement was contradicted by Guerra's statement that he returned fire after the incident with White and the ballistics evidence at trial showing that he shot four bullets.

16

First, it reasoned that Guerra fired four shots, and "we know for sure that there were two shots fired at Deputy White, and that leaves two shots unaccounted for." Second, the trial court stated that Sanchez "did credibly testify that he sensed that shots were fired in his direction." It found this evidence constituted "substantial evidence to support the jury's verdict."

On appeal, Guerra contends this ruling was an abuse of discretion because Sanchez did not testify that he sensed shots were fired in his direction and there is no evidence Guerra fired in Sanchez's direction. The trial court does appear to have misstated the evidence when it said Sanchez testified he sensed shots were fired in his direction. However, the trial court's first basis for its ruling was accurate. Ballistics evidence established that Guerra fired four shots, thus two shots in addition to those he fired at White. As described above, even if Guerra did not see Sanchez, or point a gun directly at him when he returned fire, "[t]hat degree of immediacy is not necessary." (*Chance*, *supra*, 44 Cal.4th at p. 1176.) Moreover, as the People point out, the trial court subsequently confirmed its view that by the time the assault against Sanchez took place, Guerra was "almost firing randomly," and "[t]here would be no evidence to support the allegation that Deputy Sanchez was an intended victim if not for the fact that Deputy White described the attack to him as involving two or three shots and there were four shots missing from the defendant's gun." We thus find no manifest and unmistakable abuse of discretion in the trial court's denial of Guerra's motion for a new trial.

17

# III. One of the Sentences Related to the Vasquez Family Shooting Must Be Stayed Pursuant to Section 654

For the five counts relating to Guerra's act of shooting at the Vasquez family in their vehicle, the trial court imposed the following sentences: (1) 25 years to life for the attempted murder of Vasquez (count 15); (2) 25 years to life for shooting at an occupied vehicle (count 5; concurrent); (3) 25 years to life for the assault on Vasquez's wife (count 7; concurrent); (4) 25 years to life for the assault on Vasquez's son (count 8; concurrent); and (5) 25 years to life for the assault on Vasquez's daughter (count 9; concurrent). As to counts 7, 8, and 9, the court also imposed concurrent middle terms of three years for firearm enhancements pursuant to section 12022.5, subdivisions (a) and (d). The court stayed a sentence for the assault on Vasquez (count 6) pursuant to section 654. Thus, the court imposed unstayed sentences on five counts arising out of the incident involving the Vasquez family.

Under section 654, a court may not impose multiple punishments where "a course of conduct . . . violates more than one statute but nevertheless constitutes an indivisible transaction." (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240.) However, section 654 does not prohibit multiple punishments where the act is a crime of violence against multiple victims. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1212.) The multiple-victim exception "is applicable as long as each violent offense involves at least one different victim." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1631.) It "permits one unstayed sentence per victim of all the violent crimes the defendant commits incidental to a single criminal intent. Where one person is the victim of both a shooting at an occupied motor vehicle and

18

a simultaneous assault, the trial court can impose an unstayed sentence for one or the other, but not for both.  [Citations.] . . . [T]his is equally true where the same *persons* are the victims of a shooting at an occupied motor vehicle and of simultaneous *assaults*: the trial court can impose an unstayed sentence for the shooting, based on any given victim, or for the assault on that victim, but not for both." (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1784.)

Guerra contends, and the People concede, that because there were only four victims in the vehicle, the trial court erred by imposing five sentences relating to the shooting under the multiple-victim exception to section 654.  We accept the People's concession and agree that reversal as to the sentence and remand is necessary to allow the trial court to exercise its discretion to determine as to which count it will stay the sentence pursuant to section 654.  (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

**IV.   Abstract of Judgment**

The parties contend, and we agree, that two errors in the abstract of judgment must be corrected.  (*People v. Codinha* (2023) 92 Cal.App.5th 976, 985.)

First, the abstract of judgment describes count 15 as "attempted murder of a peace officer," but it in fact related to the attempted murder of Vasquez, a civilian.  The abstract must be corrected for count 15 to reflect "attempted murder."

Second, the sentence imposed as to count 4 is the principal term of the determinate sentences in the abstract of judgment. (§ 1170.1, subd. (a).)  The abstract of judgment incorrectly indicates the term of six years was a subordinate consecutive sentence of one third of the midterm.  The abstract must be corrected to reflect that count 4 is the principal term.

## V. *Pitchess* **Review**

Before trial, Guerra filed a motion under *Pitchess*, *supra*, 11 Cal.3d 531. He sought personnel records from Deputies White, Garcia, Benjamin Sanchez, Sanchez, Martin, and nine other officers who were involved or witnesses to the November 28, 2017 shooting.

The court granted the motion as to all 14 officers, agreeing to inspect the records as to: "excessive force, dishonesty, and the new grounds that are listed in the statutes regarding the failure to report excessive force as to Deputy White, Deputy Benjamin Sanchez, Deputy Tanner Sanchez, and Deputy Robert Garcia." Regarding the other deputies "not directly involved in the actual shootings in this case," the trial court granted the motion as to "dishonesty, . . . broadly defined, including false police reports and the new ground for failing to report uses of excessive force." On June 23 and 27, 2022, the court reviewed the records in camera and found discoverable information.

Guerra now requests our independent review of the in camera portion of the trial court's *Pitchess* proceeding to determine whether the trial court properly evaluated discoverability or abused its discretion. (See *People v. Mooc* (2001) 26 Cal.4th 1216.) The People do not object. We have reviewed the sealed reporter's transcripts and conclude the court fulfilled its obligations under *Pitchess*.

20

**DISPOSITION**

The judgment is reversed and the matter is remanded to the trial court solely for purposes of resentencing.  The trial court is directed to stay the sentence under Penal Code section 654 on one of counts 5, 7, 8, 9, or 15.  The trial court is additionally directed to correct the abstract of judgment by 1) deleting the reference to attempted murder of a peace officer as to count 15 and correcting the description to reflect merely "attempted murder"; and 2) correcting the notation as to count 4 to reflect that the sentence imposed is the principal term.  The trial court is directed to forward a new, corrected abstract of judgment to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.

21